**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CASSON TALLY, for | ) | |
| NATASSIA BROUSSARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 C 4616 |
| | ) | |
| JO ANNE BARNHART, | ) | Judge Rebecca R. Pallmeyer |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Casson Talley, on behalf of her daughter Natassia Broussard ("Natassia"), filed this action for judicial review of the final decision of the Defendant Commissioner of Social Security (the "Commissioner"), denying Natassia's application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1382, 1382c. Plaintiff claims that Natassia suffers from attention deficit hyperactivity disorder and learning disorders, and that she is eligible to receive SSI benefits, under Section 1614(a)(3)(C) of the Act, as a disabled individual under the age of 18. *See* 42 U.S.C. §1382c(a)(3)(C). The parties have filed cross-motions for summary judgment. For the reasons set forth below, the Commissioner's motion is denied, Plaintiff's motion is granted in part and denied in part, and this matter is remanded to the Commissioner for further evaluation.

## PROCEDURAL HISTORY

Plaintiff applied for SSI benefits on behalf of Natassia on January 23, 2003, claiming that Natassia qualified as a disabled child due to a short attention span, hyperactivity, and difficulties with memory and comprehension. (R. 26, 47-48, 53-62.) Plaintiff alleges that Natassia, who was born on July 20, 1989, became disabled on June 1, 1999. (R. 31, 47.) The Commissioner denied the application initially, (R. 28), and upon Plaintiff's request for reconsideration. (R. 32-36.)

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), (R. 38), which was held before ALJ John Kraybill on April 29, 2004. (R. 14.) Plaintiff, Natassia, and Natassia's stepfather Charles Talley appeared and testified at the hearing. (*Id.*) Plaintiff elected to proceed without an attorney or other representative present. (*Id.*) On June 16, 2004, the ALJ rendered an unfavorable decision, concluding that Natassia has attention deficit hyperactivity disorder ("ADHD") and learning disabilities, but that her impairments were not so severe as to qualify Natassia as disabled within the meaning of the Act. (R. 18-19.)

The Appeals Council denied Plaintiff's request for review of the ALJ's decision on June 15, 2005, (R. 5), leaving the ALJ's decision as the final decision of the Commissioner. Plaintiff now seeks judicial review of that decision.

## BACKGROUND

**A.     School and Family Background**

Natassia attended Mahalia Jackson Elementary School in the Chicago Public Schools ("CPS") from the third to the sixth grade. (R. 171.) On May 7, 2002, when Natassia was a sixth grader, the school's assistant principal requested a conference with Plaintiff because Natassia was reportedly disrupting classroom procedure, not paying attention, and "sit[ting] and do[ing] nothing in class." (R. 119, 121.) On May 8, 2002, a CPS assessment team prepared an Individualized Education Plan ("IEP") for Natassia. (R. 122-28.) The CPS team determined that Natassia was eligible for special education services, and issued another IEP on July 8, 2002. (R. 129-51.) The May IEP noted that Natassia had difficulty following directions, processed information slowly, had difficulty following multiple verbal requests, was frequently distracted by extraneous noises, and was disorganized and frequently misplaced things. (R. 122.) The July IEP similarly noted that Natassia had difficulty following directions and processed information slowly, and further indicated that Natassia was distracted easily, often lost focus or concentration, and had trouble putting ideas on paper; but unlike the May IEP, the July IEP did not mention that Natassia had difficulty following

2

multiple verbal requests, was frequently distracted by extraneous noises, or was disorganized and frequently misplaced things. (R. 144.) The July IEP directed that Natassia be removed from regular class to receive special education services 21%–60% of the time.[1] (*Id.*)

Natassia transferred to Scott Joplin School—another CPS school—in Fall 2002. (R. 154, 171.) On November 13, 2002, one of her seventh grade teachers reported in an IEP form that "Natassia seem[ed] to be motivated to learn," and was "making satisfactory progress in her classes with modified instructions according to her IEP." (R. 154.) A seventh grade report card completed by a different teacher indicated several areas in which Natassia needed improvement, however, including self-control, following rules and regulations, taking part in class activities, completing assignments, showing respect for self and others, and being courteous to others. (R. 158.) Her highest grade was a "C" in "Listening Standards"; she received a "D+" in "Writing Standards" and a "D-/F" in "Mathematics Standards." (R. 157.)

On March 21, 2003, Tracy Hudson, another teacher at Scott Joplin, completed a "Teacher Questionnaire" in response to a state agency request arising from Plaintiff's application for SSI benefits. (R. 159-70.) The questionnaire rated Natassia's ability to function in five domains[2]: Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others, Moving About and Manipulating Objects, and Caring for Himself and Herself. (R. 163-170.) For the domain of Acquiring and Using Information, Hudson indicated a "slight problem" with respect to all ten criteria in the domain.[3] (R. 164.) For the domain of Attending and Completing

---

[1]  The IEP allowed for three possibilities: 0–20%, 21–60%, and 61–100%. (R. 144.) The indication of the middle range for Natassia is not accompanied by any comment.

[2]  As discussed *infra*, these domains of functioning form part of the test for childhood disability, pursuant to regulations promulgated under the Act.

[3]  The criteria were: comprehending oral instructions, understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, understanding and participating in class discussions, providing organized oral (continued...)

Tasks, Hudson indicated a "slight problem" with respect to nine of the thirteen criteria.[4] (R. 165.) For the domain of Interacting and Relating with Others, Hudson indicated only that Natassia had a "slight problem" with respecting/obeying adults in authority, and "no problem" with the remaining criteria. (R. 166.) Hudson indicated "no problem" for all criteria in the remaining domains. (R. 167-68.) There are no remarks or comments on the questionnaire.

Natassia began attending eighth grade[5] at Eisenhower Junior High School in Hoffman Estates in Fall 2003.[6] (R. 197.) In January 2004, an assessment team from Schaumburg School District 54 determined that Natassia met the criteria for a learning disability and an emotional/behavior disability,(R. 204-05), and prepared an IEP. (R. 200-02, 207-18.) Another IEP was prepared on March 18, 2004 to prepare Natassia for her freshman year at Township High School in Hoffman Estates. (R. 221-33.) The March 2004 IEP noted "evidence of a measured severe discrepancy between ability and achievement in written expression, mathematical

_____

[3](...continued)
explanations and adequate descriptions, expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. (R. 164.)

[4]     Those nine criteria were: paying attention when spoken to directly, focusing long enough to finish assigned activity/task, refocusing when necessary, carrying out single- and multi-step instructions, completing class/homework assignments, completing work accurately without careless mistakes, working without distracting self or others, and working at a reasonable pace/finishing on time. (R. 165.)

[5]     The ALJ, citing to reports from Dr. Alexis Taubert and a state agency psychologist (discussed *infra*), stated in his written decision that Natassia had repeated the seventh grade. (R.15.) Although both reports indeed contain this assertion, without any indication of its source, (R. 171, 185), the record suggests otherwise: the IEP materials from CPS indicate that Natassia was in the sixth grade in Spring 2002, (R. 109, 119); her report card for 2002-03 is for the seventh grade, (R. 156), and she testified at the hearing in April 2004 that she was in the eighth grade. (R. 238.) Her high school entering freshman test results indicate that she is in the class of 2008, which would indeed place her in the eighth grade in 2003-04. (R. 206.)

[6]     Plaintiff testified at the hearing that Natassia transferred back to an (unidentified) Chicago school in October 2003, when Plaintiff briefly moved back to Chicago, and returned to Eisenhower in January 2004. (R. 245.)

calculation, mathematical reasoning, basic reading skills and reading comprehension." (R. 223.)
The IEP further observed that "Natassia has difficulties . . . understanding what she reads,
understanding concepts, and understanding/learning new vocabulary." (*Id.*) Due to the "severity
of [Natassia's] disability," she was to be removed from the "regular education environment" and
placed exclusively in special education classrooms for the duration of the 2004-05 academic year.
(R. 230-31.)

Natassia lives with her mother, her stepfather Charles Talley, and their other children from
previous relationships. (R. 173, 244.) Natassia's parents separated in 1990, and her mother
married Charles Talley in 2001. (R. 173.) Natassia's younger sister, by a different father, has
Down's Syndrome.[7] (*Id.*) Two of Charles Talley's children, both younger than Natassia, have also
received special education services for ADHD. (*Id.*) Natassia talks to her father, who lives in
California, on a monthly basis. (*Id.*)

**B. Medical Evidence**

**1. CPS Psychological Evaluations**

On July 19, 1999, Natassia underwent a psychological evaluation through CPS Pupil
Support Services because she was failing to achieve at the expected education level. (R. 111.)
In her report, psychologist Rose Mary Finnegan noted that Natassia "has difficulty with all forms of
language-mediated learning . . . [and] may require extra cues in responding to oral or written
questions." (R. 113.) On July 8, 2002, pursuant to the July 2002 IEP from CPS, (R. 129), Natassia
was again evaluated through CPS Pupil Support Services. (R. 109.) CPS psychologist Donna
Coleman Scotti reviewed school records, interviewed Natassia, and administered tests including
the Wechsler Abbreviated Scale of Intelligence ("WASI"). (R. 110.) Natassia's WASI results
included a Verbal IQ of 85, a Performance IQ of 110, and a Full Scale IQ of 97. (*Id.*) Scotti

---

[7]    The record does not reveal whether the sister receives SSI benefits.

observed that the tests indicated a "slow-average rate of mental growth" and recommended that Natassia continue with a "resource program designed to address her learning deficits." (*Id.*)

## 2.     Clinical Psychologist: Dr. Taubert

In March and April of 2003, Natassia was examined by clinical psychologist Dr. Alexis Taubert. (R. 171.)  Dr. Taubert's report, dated May 6, 2003, notes the administration of several psychological tests, and that Natassia, her mother, and her stepfather had been interviewed.[8] (R. 171, 173-74.) Dr. Taubert also reviewed CPS records, including the psychological evaluations, the IEPs, and Natassia's report cards. (R. 172.) She noted that Natassia "can be rather explosive in terms of verbal outbursts" at home and at school, but "appears remorseful" after losing her temper.  (*Id.*)  Interpreting Natassia's teacher's report on the Conners' Teacher Rating Scale-Revised (S),[9] Dr. Taubert remarked that "Natassia displays a significant level of problem behaviors in all areas including oppositional, cognitive problems/inattention, hyperactivity, and ADHD index." (R. 175.)  In addition, Natassia's mother's report on the Conners' Parent Rating Scale-Revised[10] revealed that "Natassia displays significant inattentive symptoms and additional symptoms in terms of hyperactivity, restless/impulsive." (*Id.*)  Based on Natassia's mother's report on the Vineland Adaptive Behavior Scales[11] ("Vineland"), however, Dr. Taubert found only "mild

---

[8]     Dr. Taubert's report does not reveal whether she administered these tests personally; it appears that unidentified staff were involved in the evaluation as well.

[9]     The Conners' Teacher Rating Scale is used to determine the teacher's view of a child's behavior in the classroom. *Matos ex rel. Mota v. Barnhart*, No. 05 Civ. 10539(NRB), 2007 WL 943654, at *2 n.5 (S.D.N.Y. Mar. 27, 2007) (citation omitted).

[10]     The Conners' Parent Rating Scale "is an instrument designed to measure major types of behavioral problems by characterizing the behaviors of a child," *Oliver ex rel. Oliver v. Apfel*, No.C98-4118-MWB, 2000 WL 34032755, at *2 n.3 (N.D. Iowa Feb. 9, 2000) (internal quotation marks and citation omitted), through parental reports of childhood behavior problems. *See* C. Keith Conners et. al, *The Revised Conner's Parent Rating Scale (CPRS-R): Factor Structure, Reliability, and Criterion Validity*, 26 J. ABNORMAL CHILD PSYCHOL. 257, 257 (1998).

[11]     The Vineland "measures personal and social sufficiency in the following three
(continued...)

deficits" in the domains of Communication, Daily Living Skills, and Socialization. (R. 174.) Dr. Taubert further noted that Natassia's verbal skills were significantly lower than her visual-motor abilities. (R. 176.)

Based on her "overall impression" and the Conners' scores, Dr. Taubert diagnosed Natassia with ADHD, Learning Disorder NOS,[12] Parent-Child Relational Problem, and Problems with Primary Support Group: Remarriage of Parent. (R. 177.) Dr. Taubert provided a Global Assessment of Functioning ("GAF") score of 60,[13] and recommended psychiatric evaluation to consider the use of medication for ADHD, and both individual and family therapy. (*Id.*)

### 3. Pediatric Neurologist: Dr. Tonsgard

Dr. James Tonsgard, a pediatric neurologist at University of Chicago Children's Hospital, first examined Natassia on October 11, 2002 "for evaluation of school problems." (R. 152-53.) Dr. Tonsgard noted "problems in school for the last three years," including daydreaming, failure to respond to directions, and trouble focusing, and that her family reported that Natassia had "significant mood swings with behavioral outbursts and can even become violent." (R. 152.) A physical examination and an EEG revealed no abnormalities. (R. 152-53.) Dr. Tonsgard reviewed Natassia's July 2002 IEP from CPS, including the WASI results. (R. 153.) He noted the large discrepancy between the verbal and performance scores in the WASI, and further observed that

---

[11](...continued)
domains: communication, involving the skills required for receptive, expressive, and written language; daily living skills, including the practical skills that are needed to take care of one's self and contribute to a household; and socialization, which pertains to those skills needed to get along with others." *Jefferson v. Barnhart*, 356 F. Supp. 2d 663, 674-75 (S.D. Tex. 2004).

[12]       The designation "NOS", which stands for "not otherwise specified," is used when a mental disorder appears to fall within a larger category but does not meet the criteria of any specific disorder within that category. BehaveNet Clinical Capsule, http://www.behavenet.com/capsules/disorders/nos.htm.

[13]       A GAF score of 60 represents moderate difficulties in social or school functioning. *See* DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994).

Natassia's achievement levels placed her between the fourth and fifth grades; she was in the seventh grade at the time of the examination. (*Id.*) He also noted "staring episodes." (*Id.*) Dr. Tonsgard concluded that "this is a girl with a learning disability," but remarked that in light of behavioral difficulties, there was also "a question of oppositional defiant disorder, as opposed to the attention deficit disorder." (*Id.*) He recommended counseling. (*Id.*)

On April 8, 2003, Dr. Tonsgard submitted a "Neurological Report for Children," in response to a state agency request for medical records to evaluate Natassia's eligibility for SSI benefits, indicating that he had last seen Natassia on November 15, 2002. (R. 180.) He nevertheless diagnosed a "severe learning disability," as well as a "significant emotional disorder" characterized by sometimes violent mood swings. (R. 180-81.) He again noted the 25-point discrepancy between her verbal and performance test scores. (R. 181.)

On July 8, 2003, Dr. Tonsgard completed a form titled "Diagnosis of Mental Impairments" that pertained specifically to ADHD. (R. 99.) This form corresponds with Listing 112.11 of the Social Security Regulations; as discussed *infra*, that listing contains criteria which, if sufficiently met, would result in a finding that a claimant is disabled due to ADHD. Dr. Tonsgard indicated on this form that there were medically documented findings of "Marked inattention" and "Marked impulsiveness," but no findings of "Marked hyperactivity."[14] (*Id.*) He further indicated "marked impairment" in age-appropriate cognitive and communicative function, social functioning, and personal function. (R. 101.) Finally, he indicated that Natassia had deficiencies in concentration, persistence, or pace, resulting in frequent failure to complete tasks in a timely manner. (*Id.*)

On October 18, 2003, Dr. Tonsgard completed a "Medical Certification" form for Schaumburg School District 54, indicating that Natassia was eligible for "medical busing" for the

---

[14]     The form defined "marked" as "more than 'moderate' but less than 'extreme.'" (R. 99.) Dr. Tonsgard did not explain the source of the "medically documented findings."

2003-04 school year on the basis of Natassia's "severe learning disability."[15]  (R. 197.)  In March 2004, he prescribed the ADHD medication Metadate for Natassia, (R. 199), but on April 22, 2004 prescribed Strattera instead.[16]  (R. 198.)  At the hearing on April 29, 2004, Natassia's stepfather testified that the Metadate had been ineffective in relieving Natassia's attention and focus issues. (R. 242-43.)

### 4.     State Agency Psychologists

On May 7, 2003, state agency psychologist Bronwyn Rains completed a "Childhood Disability Evaluation Form" that concluded that Natassia's impairments, which Rains identified as ADHD and Learning Disorder, did not meet, medically equal, or functionally equal a listed impairment.  (R. 183.)  Evaluating six domains of functioning, Rains indicated "less than marked" limitations in Acquiring and Using Information and Attending and Completing Tasks, and no limitations in Interacting and Relating with Others, Moving and Manipulating Objects, Caring for Yourself, and Health and Physical Well-being.  (R. 185-86.)  Rains based that determination on a review of reports from Dr. Zaheer,[17] Dr. Tonsgard, Joplin School, and Dr. Taubert, (R. 188); there is no indication that Rains ever personally examined Natassia.  A second state agency reviewing psychologist, John Tomassetti, signed the report as an additional consultant.  (R. 184.)

On July 31, 2003, Tomassetti completed his own assessment, apparently in response to Plaintiff's June 19, 2003 request for reconsideration of the Commissioner's initial denial of benefits.

---

[15]     The record does not reveal why a request for "medical busing" for Natassia was made, nor the source of that request, nor what "medical busing" entails.

[16]     Metadate and Strattera are both used to treat ADHD.  *See* Consumer Drug Information, http://www.drugs.com/pdr/metadate.html; http://www.drugs.com/cdi/strattera.html.
It is unclear when Dr. Tonsgard first prescribed medication.  Plaintiff testified at the hearing that Natassia had been taking Metadate at least as early as January 2004.  (R. 245.)

[17]      In conjunction with CPS's special education eligibility determination, Dr. Qudsia Zaheer conducted a physical examination of Natassia; the report of this examination included in the record, dated May 20, 2002, contains no psychological findings.  (R. 119-20.)

(R. 190.) Tomassetti reached the same conclusion as in Rains' earlier report, except that Tomassetti now indicated a "less than marked" limitation in the domain of Interacting and Relating with Others as well. (R. 191.) Remarking on this finding, Tomassetti noted a "parent child problem" but observed that Natassia's mood swings were not "demonstrated during the school environment." (*Id.*)

## C.    Allegations in Application Forms

In a Function Report completed by Plaintiff on February 19, 2003 as part of the initial application for benefits, Plaintiff reported that Natassia, then 13 years old, was unable to tell time, could not understand money or make change, and could not understand, carry out, and remember simple instructions. (R. 70-71.) In another Function Report dated March 3, 2003, Plaintiff answered "no" to questions asking whether Natassia could explain simple and complex ideas, explain why she did something, answer a telephone and take messages, shop independently, and report what she had read in a news article; Plaintiff also indicated that Natassia was incapable of understanding and carrying out verbal instructions. (R. 88.) Plaintiff wrote that Natassia "[does] not understand what you are saying," and that Plaintiff had "to constantly repeat [herself]." (R. 88-89.) In a Reconsideration Disability Report completed on September 11, 2003, Plaintiff wrote that she had to "repeat [herself] more and more" with Natassia, and that Natassia could not "complete a chore, homework or any tasks." (R. 82.) Plaintiff further reported that Natassia was unable to avoid arguments and fights with peers or to resolve conflicts with others, and felt that rules did not apply to her. (R. 88.)

## D.    Plaintiff's Testimony[18]

At the hearing before the ALJ on April 29, 2004, Plaintiff reported that Natassia would not complete chores unless Plaintiff repeated instructions. (R. 244.) She testified that Natassia had

---

[18]    Natassia and her stepfather Charles Talley also testified briefly, but their testimony provides little relevant information. (R. 238-43.)

last seen Dr. Tonsgard in January 2004, at which time Plaintiff told him that the Metadate was ineffective; Dr. Tonsgard increased the dosage, but Plaintiff saw no change. (R. 245-46.) Dr. Tonsgard then prescribed Strattera over the phone. (R. 246.) Plaintiff reported that Natassia was sometimes "hyper." (*Id.*)

Plaintiff also testified that Natassia had recently told a school counselor that when she started high school, she would "shoot them and blow up everybody and blow up the school." (R. 247.) This incident resulted in police questioning the family about whether there were "guns in the house." (*Id.*)

E.    **Medical Expert's Testimony**

Clinical Psychologist Dr. Kenneth Kessler testified as a medical expert ("ME") at the hearing. (R. 46, 249-53.) Dr. Kessler testified that while Natassia had been diagnosed with ADHD, she did not meet the requirements of Listing 112.11 because Dr. Tonsgard had not indicated a marked impairment in hyperactivity. (R. 250.) Dr. Kessler also noted the Teacher Questionnaire completed by teacher Tracy Hudson in March 2003, which he observed indicated only slight problems in the areas of Acquiring and Using Information and Attending and Completing Tasks, and no problems of any significance in Interacting and Relating with Others or the remaining domains. (*Id.*)

Dr. Kessler also placed particular emphasis on Vineland results, but his testimony in this regard is somewhat confusing. Noting Dr. Taubert's report, he testified that "Vinelands based on a parent interview" showed that Natassia displayed "significant difficulties in a number of domains." (R. 251.)  Noting the January 2004 IEP from Schaumburg Schools, he testified that "Vinelands . . . completed by the school district, indicated only mild impairments in all of the functional domains with the exception of communication, which was listed as below average." (*Id.*) In fact, while Dr. Taubert's report indeed notes "significant" behavior problems in a number of domains based on Conners' tests, the specific Vineland results from an interview with Natassia's mother indicated only "mild deficits" in the domains of Communication, Socialization, and Daily

Living skills.  (R. 174.)  Moreover, Schaumburg Schools did not in fact conduct any independent Vineland testing; rather, the January 2004 IEP cites the above Vineland results from Dr. Taubert's report, indicating "mild deficits" in the three domains, and the July 8, 2002 psychological evaluation from CPS, which, according to the IEP, showed "below average skills in the area of communication on the [Vineland]."  (R. 201.)  That CPS evaluation makes no reference to any Vineland test or results.  (R. 109-110.)

Dr. Kessler concluded that in the domain of Acquiring and Using Information, Natassia's functional limitation was "less than marked."  (R. 251.)  In the domain of Interacting and Relating with Others, he found no limitation.  (*Id.*)  With respect to the domain of Attending and Completing Tasks, Dr. Kessler gave conflicting testimony.  Based on the "record from teachers," he opined that Natassia's impairments in this domain were "less than marked," (*id.*); but he also remarked that Plaintiff's testimony at the hearing "indicate[d] more severity there as more consistent with a marked impairment," (*id.*), and under questioning from Plaintiff, testified that the level of impairment in the domain of Attending and Completing Tasks "would be rated as marked based on the new information we received here today from the testimony."  (R. 253.)  He did not identify the specific testimony to which he was referring.

Dr. Kessler found no limitations in remaining domains of Moving About and Manipulating Objects, Caring for Oneself, and Health and Physical Well-being.  (R. 251, 253.)

## F.    The ALJ's Findings

### 1.    The SSI Childhood Disability Standard

Under the Act, a child under the age of 18 is "disabled" if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The Social Security Administration ("SSA") has promulgated regulations establishing a three-step sequential evaluation

process to determine childhood disability.  *See* 20 C.F.R. § 416.924(a).  At step one, a child is not

disabled if engaged in substantial gainful activity.  20 C.F.R. § 416.924(b).  At step two, the SSA

will find the child not disabled unless her medically determinable impairments are severe, meaning

that they cause more than minimal functional limitations.  20 C.F.R. § 416.924(c).  At step three,

the child's impairments must meet, medically equal, or functionally equal the listings in 20 C.F.R.

Part 404, Subpart P, Appendix 1; if none do, the child is not disabled.  20 C.F.R. § 416.924(d).

Listing 112.11 addresses ADHD specifically.  20 C.F.R. Pt. 404, Sbpt. P, App. 1 § 112.11.

Like many of the listed impairments, it provides a list of criteria, in two categories, that an

impairment must meet or medically equal for the claimant to be deemed disabled; both categories

must be satisfied.  Category A requires the claimant to produce "[m]edically documented findings"

of all three of the following:

1.  Marked inattention; and
2.  Marked impulsiveness; and
3.  Marked hyperactivity[.]

*Id.*  To satisfy category B, the condition in category A must result, for children between the ages of

3 and 18, in at least two of the following:

a.  Marked impairment in age-appropriate cognitive/communicative function . . . ; or
b.  Marked impairment in age-appropriate social functioning . . . ; or
c.  Marked impairment in age-appropriate personal functioning . . . ; or
d.  Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Sbpt. P, App. 1 § 112.02(B)(2).

If an impairment does not sufficiently satisfy both categories, the child is nonetheless

deemed disabled if the impairment "functionally equals" a listing.  20 C.F.R. § 416.924(d).  A child's

impairment functionally equals a listing if it results in "marked" limitations in two of the following six

domains of functioning, or an "extreme" limitation in one domain:

i.  Acquiring and using information;
ii.  Attending to and completing tasks;
iii.  Interacting with and relating to other people;

<ol type="i" start="4">
<li>Moving about and manipulating objects;</li>
<li>Caring for [one]self; and,</li>
<li>Health and physical well-being.</li>
</ol>

20 C.F.R. § 416.926a(a) & (b)(1); *see Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003). A limitation is "marked" in a domain if an impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). In a more general sense, a "marked" limitation "also means a limitation that is 'more than moderate' but 'less than extreme.'" *Id.*

## 2. The ALJ's Determination

Proceeding under the above framework, ALJ Kraybill concluded that Natassia was not disabled withing the meaning of the Act. (R. 18.) At step one, he found that Natassia had never engaged in substantial gainful activity. (*Id.*) At step two, he found that Natassia has ADHD and learning disabilities, both of which constitute "severe" impairments within the meaning of 20 C.F.R. § 416.924(c). (*Id.*) At step three, however, he found that Natassia's impairments did not meet or medically equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, and further did not functionally equal the severity of a listing because Natassia did not have an "extreme" limitation in any domain of functioning, or a "marked" limitation in any two domains. (*Id.*)

The ALJ's written decision discusses the evidence he relied on in making these determinations. At the outset, he noted that Natassia receives special education services for learning disabilities, and asserted that she had had to repeat the seventh grade.[19] (R. 15.) He also noted Natassia's July 8, 2002 WASI results, which had yielded a verbal IQ of 85, a performance IQ of 110, and a full scale of 97, placing her in the slow-average rate of intellectual functioning. (*Id.*) He remarked that Dr. Tonsgard had noted the 25-point difference between Natassia's performance IQ and her verbal IQ. (*Id.*) The ALJ also observed that Dr. Tonsgard had diagnosed Natassia with

---

[19]    As noted, the record does not appear to support this finding.

14

ADHD and learning disabilities, but had stated that Natassia's "staring episodes" might be oppositional defiance. (*Id.*) The ALJ further noted Natassia's GAF score of 60, but incorrectly attributed that finding to Dr. Tonsgard rather than to Dr. Taubert. (*Id.*)

The ALJ also considered Vineland results, remarking that the Vineland "completed by the claimant's parent" had "revealed significant difficulties in a number of domains," but that "school district" Vineland results indicated only "mild limitations in all functional domains" except for communication "which was listed as below average." (R. 16.) He further noted that the Teacher Questionnaire completed by Hudson in March 2003 showed "'slight' limitations in acquiring and using information, and in attending and completing tasks, but no problems of any significance in interacting and relating with others and self help." (*Id.*)

Based on the medical evidence, the ALJ determined that Natassia suffered from ADHD and a learning disability disorder, both of which qualified as "severe." (*Id.*) Proceeding to step three of the childhood disability framework, the ALJ first determined that Natassia's impairments did not meet or medically equal the requirements of Listing 112.11 because the "marked hyperactivity" criterion in category A had not been satisfied. (*Id.*) In making this determination, the ALJ relied on the form labeled "Diagnosis of Mental Impairments" that Dr. Tonsgard had completed in July 2003, and which specifically pertained to Listing 112.11 for ADHD. The ALJ noted that while Dr. Tonsgard had indicated the presence of all the "B" criteria, as well as the presence of "marked inattention" and "marked impulsiveness" in the "A" category, he had indicated that there were no medically documented findings of "marked hyperactivity." (*Id.*) The ALJ further noted that Dr. Kessler had testified that Natassia's impairments did not meet Listing 112.11. (*Id.*)

The ALJ then addressed whether Natassia's impairments were functionally equivalent to the listings, by considering Natassia's limitations in the six domains of functioning set forth in 20 C.F.R. § 416.926a(b)(1). He evaluated Natassia as a child of between the ages of 12 and 18. (R. 17.) In making this evaluation, the ALJ referred only to Dr. Kessler's testimony. In the domain

of Acquiring and Using Information, the ALJ stated merely that "Dr. Kessler testified that limitations are less than marked in this domain." (*Id.*)  In the domain of Attending to and Completing Tasks, he stated that "Dr. Kessler testified that based on teachers [sic] comments and on the record, limitations are less than marked in this domain." (*Id.*)  In the domain of Interacting and Relating with Others, he stated that "Dr. Kessler testified that there are no limitations" in that domain. (*Id.*)  For the remaining domains of Moving About and Manipulating Objects, Caring for Oneself, and Health and Physical Well-being, the ALJ's analysis similarly consisted entirely of statements that Dr. Kessler had found no limitations.  (R. 17-18.)

Finding no marked limitations in at least two domains nor an extreme limitation in any one domain, the ALJ concluded that Natassia did not have an impairment functionally equivalent to the listings.  (R. 18.)  The ALJ stated that in reaching that conclusion, he "considered the assessment made by the state agency physician regarding the claimant's impairments and the effects upon his [sic] development." (*Id.*)  The ALJ thus concluded that Natassia was not disabled.  (*Id.*)

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. *See* 42 U.S.C. § 405(g).  In reviewing this decision, the court does not engage in its own analysis of whether Natassia is disabled.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).  Nor will it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted).  The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)).  Evidence is substantial "if a reasonable person would accept it as adequate to support the conclusion." *Id.* (citation omitted).

Although this court accords great deference to the ALJ's determination, it "must do more

16

than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the decision to ensure that the ALJ has "articulate[d] some legitimate reason for his decision" and built an "accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000). The ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003) and *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003)). Where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## B.    Analysis

Plaintiff challenges the ALJ's step three determination on two grounds. First, she contends that the ALJ's determination that Natassia's impairments do not functionally equal a listing was not based on substantial evidence. Specifically, she argues that in concluding that Natassia had no marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with Others, the ALJ improperly adopted without analysis the summary conclusions of Dr. Kessler's testimony, without addressing evidence in the record that contradicted those conclusions. (Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Pl.'s Mem."), at 1, 6-11.) Second, Plaintiff argues that the ALJ failed to fully develop the record with regard to Natassia's hyperactivity, which, if established, would have mandated a finding that Natassia met the criteria of Listing 112.11. (*Id.* at 13.) Plaintiff requests an order granting Natassia SSI benefits, or, alternatively, that this case be remanded for further proceedings. (*Id.* at 14.) The court considers Plaintiff's arguments in turn.

### 1.    Functional Equivalence

The ALJ found that Natassia had no marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with Others.

17

Plaintiff argues that in making this finding, the ALJ improperly relied upon selected summary conclusions of Dr. Kessler's testimony to the exclusion of other evidence contradicting those conclusions. (*Id.* at 6.) The court addresses each domain separately.

### a.    Acquiring and Using Information

This domain pertains to how well a claimant acquires and learns information, and how well the claimant uses information she has learned. 20 C.F.R. § 416.926a(g). For adolescents between the ages of 12 and 18, SSA regulations explain that

> . . . you should continue to demonstrate what you have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments). You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas). You should also learn to apply these skills in practical ways that will help you enter the workplace after you finish school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer).

20 C.F.R. § 416.926a(g)(2)(v).

The ALJ's analysis of Natassia's functional limitation in the domain of Acquiring and Using Information consisted of one sentence: "Dr. Kessler testified that limitations are less than marked in this domain." (R. 17.) Dr. Kessler indeed so testified, and although Plaintiff contends that this represents the whole of his testimony on the subject, Dr. Kessler had in fact noted two pieces of evidence: Hudson's March 2003 Teacher Questionnaire, which indicated "slight problems" in this domain, (R. 164, 250); and "Vinelands . . . completed by the [Schaumburg] school district [which] indicated only mild impairments in all the functional domains . . . ." (R. 251.)

Plaintiff, however, points to a good deal of evidence in the record that suggests limitations of Natassia's ability to acquire and use information, but that neither Dr. Kessler nor the ALJ addressed. Plaintiff highlights, *inter alia*, Dr. Tonsgard's indication in the "Diagnosis of Mental Impairments" for Listing 112.11 that Natassia had a marked impairment in age-appropriate cognitive

18

and communicative function (one of the "B" criteria in the listing), (R. 101); achievement test results, noted by Dr. Tonsgard, that placed Natassia, a seventh grader, at the fourth or fifth grade level,[20] (R. 153); Plaintiff's assertions in SSI application materials that Natassia could not tell time, understand money or make change, or carry out simple instructions, (R. 71, 88); Natassia's seventh grade report card, indicating difficulties in a number of areas, (R. 157); Natassia's initial (1999) CPS psychological evaluation, noting that she "has difficulties with all forms of language-mediated learning," (R. 113); IEP materials from Schaumburg schools, noting that Natassia's "ability to acquire knowledge commensurate with her cognitive skills adversely affects her progress in reading, math, writing, and communication[]," (R. 208); and the fact that Natassia was to be placed exclusively in special education classrooms when she started high school in Fall 2004. (R. 231; Pl.'s Mem., at 7-8.) The ALJ's decision contains no discussion of this evidence.

The Commissioner points to the reports of state agency psychologists Rains and Tomassetti, both of whom found that Natassia had a "less than marked" limitation in the domain of acquiring and using information. (R. 188, 191; Commissioner's Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem."), at 9.) The ALJ did not substantively discuss those reports, however: the sole reference to state agency reports in his written decision appears in the following sentence tacked on to the end of his discussion: "the undersigned has considered the assessment made by the state agency physician regarding the claimant's impairments and the effects upon his [sic] development." (R. 18.) This appears to be boilerplate language, particularly as Rains and Tomassetti are psychologists, not physicians, and Natassia is not male. In any event, this oblique reference does not amount to the type of discussion of medical evidence that permits meaningful judicial review. *See Young*, 362 F.3d at 1002.

The Commissioner further notes that the ALJ's determination was "consistent with" the

---

[20]     Plaintiff's contention that the results showed that Natassia was "four grades below" her chronological grade level is an exaggeration. (Pl.'s Mem., at 7.)

questionnaire completed by Tracy Hudson, who indicated only a "slight problem" in the domain of Acquiring and Using Information, (R. 164), as well as the Vineland results in Dr. Taubert's report, showing that Natassia had only "mild deficits" in the domains of communication, daily living skills, and socialization. (R. 174.) The Commissioner does not explain how the results with respect to communication, daily living skills, and socialization are dispositive of Natassia's ability to acquire and use information; nor does the Commissioner address Dr. Taubert's finding, based on the Conners' tests, that Natassia displayed "a significant level of problem behaviors in all areas including . . . cognitive problems/inattention" and "significant inattentive symptoms." (R. 175.) Moreover, Dr. Kessler's testimony that the Vineland results in Dr. Taubert's report indicated mild deficits in "all the functional domains" may not be relevant to the question of whether Natassia's impairments are functionally equivalent to a listing: as noted, that Vineland referred to the domains of communication, daily living skills, and socialization, and not to the six specific domains of the functional equivalence test. Finally, as noted, Dr. Kessler (and the ALJ) mistakenly believed that there were two separate Vineland results in the record: one based on Natassia's mother's report, showing "significant problems in a number of domains"; and a second, "completed by the school district," showing only "mild deficits." (R. 251.) In fact, Schaumburg schools conducted no independent Vineland testing, but rather noted the Vineland results in the report prepared by Dr. Taubert and based on input from Natassia's mother.

More importantly, Plaintiff does not argue that the record contains *no* evidence consistent with the ALJ's determination; rather, Plaintiff contends that the ALJ failed to analyze any evidence apart from Dr. Kessler's conclusions, and further failed to address other evidence that was less consistent with those conclusions. The Commissioner does not respond to this argument, which the court finds persuasive. An ALJ must "'sufficiently articulate his assessment of the evidence to assure [the court] that [he] considered the important evidence,'" so as to enable the court "to trace the path of [his] reasoning." *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (quoting *Rohan v.*

*Chater*, 98 F.3d 966, 971 (7th Cir. 1996)). Although the Commissioner is correct that Hudson's Teacher Questionnaire is consistent with a finding of a less than marked limitation in the domain of Acquiring and Using Information, it is not clear whether the ALJ in fact relied on that evidence or found it persuasive. The ALJ did note, in summarizing Dr. Kessler's testimony, that the ME had considered that report; but the ALJ's discussion of Natassia's functional limitations makes no mention of it.[21]

The court further agrees that the ALJ failed to confront evidence inconsistent with his determination that Natassia had no marked impairment in this domain. As noted, an ALJ is obligated to "confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto*, 374 F.3d at 474 (citations omitted). The ALJ nowhere addressed the lengthy list of evidence that Plaintiff points to; and of this evidence, Dr. Tonsgard's finding of a marked impairment in age-appropriate cognitive and communicative function constitutes a particularly glaring omission. Significantly, in determining that Natassia satisfied all the "B" criteria of Listing 112.11 but not the "A" criterion of "marked hyperactivity," the ALJ relied on Dr. Tonsgard's "Diagnosis of Mental Impairments." (R. 16.) In his use of this report as evidence that Natassia did not suffer from marked hyperactivity, the ALJ demonstrated that he found Dr. Tonsgard's findings credible; yet in evaluating Natassia's limitations in the domain of Acquiring and Using Information, the ALJ failed to explain whether or why he considered Dr. Tonsgard's other finding—that Natassia had a marked impairment in cognitive and communicative function—not relevant to the issue.

The court concludes that in light of the ALJ's threadbare analysis and his failure to confront evidence contrary to his conclusion that Natassia had no marked limitation in the domain of

---

[21]     Furthermore, as Plaintiff points out, (Pl.'s Mem., at 11-12), Hudson's report provides no information beyond indicating scores for the criteria in each domain. Hudson offered no comments or remarks where the questionnaire requested narrative information; and even basic fields such as how long Hudson had known Natassia, how often Hudson saw her, and Natassia's grade level, are left blank.

Acquiring and Using information, this case must be remanded for a more meaningful discussion of the evidence.

### b.    Attending and Completing Tasks

This domain relates to how well a claimant can focus and maintain attention, and how well she can begin, carry through, and finish activities, including the pace at which the claimant can perform activities and the ease with which she can change them. 20 C.F.R. § 416.926a(h). The regulations explain that an adolescent like Natassia

> . . . should be able to pay attention to increasingly longer presentations and discussions, maintain [her] concentration while reading textbooks, and independently plan and complete long-range academic projects. [She] should also be able to organize [her] materials and to plan [her] time in order to complete school tasks and assignments. In anticipation of entering the workplace, [she] should be able to maintain [her] attention on a task for extended periods of time, and not be unduly distracted by [her] peers or unduly distracting to them in a school or work setting.

20 C.F.R. § 416.926a(h)(2)(v).

ALJ Kraybill's discussion of the domain of Attending and Completing Tasks consists of the sentence "Dr. Kessler testified that based on teachers [sic] comments and on the record, limitations are less than marked in this domain." (R. 17.) This characterization of Dr. Kessler's testimony is less than complete. Dr. Kessler did initially opine that based on the "record from teachers"—whom he neither identified nor discussed—Natassia's impairments in this domain were "less than marked." (R. 251.) He also testified, however, that (unidentified) portions of Plaintiff's testimony at the hearing "indicate[d] more severity there as more consistent with a marked impairment." (*Id.*) He later reiterated that Natassia's level of impairment in the domain "would be rated as marked based on the new information we received here today from the testimony." (R. 253.) The ALJ did not, in his written decision, address Dr. Kessler's testimony regarding the possibility of a greater impairment; nor did he mention the other testimony at the hearing to which Dr. Kessler referred.

Plaintiff, moreover, again provides a list of evidence that the ALJ did not address, and that

may suggest more severe limitations in this domain. This evidence includes Dr. Tonsgard's finding, in the "Diagnosis of Mental Impairments" for Listing 112.11, that Natassia suffered from "[d]eficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner[,]" (R. 101); an observation in the July 2002 CPS psychological evaluation that Natassia "doesn't stay on task" and "works slowly, seems immature, and is disorganized[,]" (R. 109); Natassia's CPS IEPs from May and July 2000, which indicate that she had difficulty following directions and multiple verbal requests, was frequently distracted by extraneous noises, and often lost focus or concentration, (R. 122, 144); and Dr. Taubert's observation that Natassia "needed some reminders to stay on task" during psychological testing. (R. 173.)

Although the Commissioner again points to the reports from the state agency psychologists, this argument is unconvincing, as explained above, because the ALJ did not discuss those reports in any detail. The Commissioner further highlights observations from teachers' reports that were more consistent with the ALJ's determination: the comment from one seventh grade teacher on an IEP form that Natassia "seems to be motivated to learn" and was "making satisfactory progress in her classes with modified instructions according to her IEP[,]" (R. 154); her seventh grade report card, in which another teacher did not check the boxes labeled "follows directions" and "works independently" as areas needing improvement, (R. 158); and Tracy Hudson's state agency questionnaire indicating only a "slight problem" with respect to nine of thirteen criteria in the domain of Attending and Completing Tasks. (R. 165.) Because the ALJ did not refer to any of this evidence in his discussion of Natassia's functional limitations, however, the court is unable to ascertain the extent to which the ALJ considered it. Nor can the court determine the extent to which Dr. Kessler may have relied on this evidence, because except for Hudson's questionnaire, he failed to identify which teachers' reports he considered, or to note any specific portions of those reports. Finally, and most importantly, the ALJ again failed to confront the evidence, identified by Plaintiff, supporting a contrary conclusion; in particular, the ALJ apparently overlooked Dr. Tonsgard's

finding that Natassia had deficiencies of concentration, persistence, or pace that resulted in her "frequent failure to complete tasks in a timely manner." (R. 101.)

The court concludes that the ALJ failed to fully explain his reasoning and to confront evidence supporting a determination contrary to his conclusion that Natassia had no marked limitation in the domain of Attending and Completing tasks. Moreover, because the ALJ relied exclusively on the ME's conflicting testimony, which in fact suggested a more severe limitation in this domain, the court is unable to determine whether the ALJ's decision was based on substantial evidence. A remand is necessary so that the ALJ can engage in a more meaningful discussion of the evidence, in particular as to Dr. Tonsgard's finding as noted above, and as to Dr. Kessler's testimony.

### c.    Interacting and Relating with Others

This domain addresses, *inter alia*, a claimant's ability to initiate and sustain emotional connections with others, cooperate with others, comply with rules, and respond to criticism. 20 C.F.R. § 416.926a(i). The regulations explain that a child of Natassia's age

> should be able to initiate and develop friendships with children who are [her] age and to relate appropriately to other children and adults, both individually and in groups. [She] should begin to be able to solve conflicts between [her]self and peers or family members or adults outside [her] family. . . . [She] should be able to intelligibly express [her] feelings . . . in all kinds of environments (e.g., home, classroom, sports, extra-curricular activities, or part-time job), and with all types of people (e.g., parents, siblings, friends, classmates, teachers, employers, and strangers).

20 C.F.R. § 416.926a(i)(2)(v).

With respect to the domain of Interacting and Relating with Others, the ALJ stated only that "Dr. Kessler testified there are no limitations" in the domain. (R. 17.) In his testimony, Dr. Kessler noted Hudson's state agency questionnaire, which indicated that Natassia had a "slight problem" with respecting and/or obeying adults in authority, and the Vineland results, which, as noted, he incorrectly believed had been completed by Schaumburg schools. (R. 250-51.) Plaintiff again

points to evidence that suggests more severe limitations in this domain, including Dr. Tonsgard's indication in the "Diagnosis of Mental Impairments" that Natassia had a marked impairment in age-appropriate social functioning, (R. 101); his note in the October 2002 examination report that Natassia's family had reported that she experienced "significant mood swings with behavioral outbursts and can even become violent[,]" (R. 152); Dr. Taubert's observations that Natassia "can be rather explosive in terms of verbal outbursts" at home and at school, and that "she can be destructive . . . or become physically aggressive[,]" (R. 172, 174); an observation in Natassia's January 2004 IEP that she "displays inappropriate behaviors (yelling, cursing) to both peers and staff," (R. 205); the March 2004 IEP, citing Natassia's "inability to develop or maintain satisfactory interpersonal relationships with peers and adults[,]" (R. 223); Plaintiff's indications in SSI application materials that Natassia was unable to avoid arguments and fights with peers or to resolve conflicts with others, and that she felt that rules did not apply to her, (R. 88); and finally, Plaintiff's testimony at the hearing that Natassia had recently told a school counselor that when she started high school, she would shoot the other students and "blow up everybody and blow up the school"—a remark apparently taken so seriously that it resulted in police questioning Natassia's family about her access to guns. (R. 247.) Neither Dr. Kessler nor the ALJ addressed any of this evidence.

The Commissioner concedes that the record contains "mixed" evidence of Natassia's ability to interact and relate with others, but maintains that this evidence does not "rise to the marked level of severity." (Def.'s Mem., at 11.) The Commissioner points to evidence consistent with a less-than-marked limitation, including that Dr. Taubert had assigned a GAF of 60, representing only moderate social difficulties, (R. 177); that state agency psychologist Tomassetti remarked that Natassia's mood swings were not "demonstrated during the school environment[,]" (R. 191); and that Plaintiff testified that Natassia has friends in her neighborhood, and had answered "fine" to a question on a CPS IEP form that asked how Natassia got along with other children. (R. 151, 246.) This argument is unavailing, however, because the court cannot ascertain from the ALJ's decision

whether he in fact relied on any of this evidence. Although the ALJ noted Natassia's GAF score at the beginning of his written decision, (R. 15), his discussion of functional limitations, as noted, refers only to Dr. Kessler's conclusions; and Dr. Kessler, for his part, did not refer in his testimony to the GAF score or indeed to any of the evidence cited by the Commissioner.

Moreover, the Commissioner, by contending merely that the record contains some evidence consistent with the ALJ's determination, fails to counter Plaintiff's argument that other evidence suggests more serious limitations. In light of the evidence cited by Plaintiff, in particular Dr. Tonsgard's report of a marked impairment in social functioning, the court concludes that the ALJ failed to fully confront the evidence that did not support his conclusion that Natassia had a less than marked impairment in the domain of Interacting and Relating with Others. The ALJ thus failed to base his decision on substantial evidence. As with the previous two domains, the ALJ on remand should engage in a more meaningful discussion of the opposing evidence in the record.

### 2.    Development of the Record

Plaintiff also argues that the ALJ failed to sufficiently develop the record with regard to Natassia's hyperactivity. (Pl.'s Mem., at 12-13.) An ALJ has a duty to develop a full and fair record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). If the ALJ has insufficient evidence on which to determine that a claimant is disabled, or cannot reach a conclusion after weighing conflicting evidence, he must try to obtain additional evidence by requesting additional existing records, recontacting medical sources, asking the claimant for more information, or asking the claimant to undergo a consultative examination. *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994); 20 C.F.R. § 416.912(e) & (f). Although the ALJ "has a heightened duty to make sure that the record is developed when a claimant is unrepresented," *Luna*, 22 F.3d at 692 (citing *Thompson v. Sullivan*, 933 F.2d 581, 587 (7th Cir. 1991)), the ALJ's decision on how much evidence to gather is entitled to deference. *Id*; *see Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993).

Plaintiff concedes that Dr. Tonsgard indicated on the "Diagnosis of Mental Impairments" for Listing 112.11 that there were no medically documented findings of hyperactivity, but contends that Plaintiff's testimony at the hearing, combined with certain observations in Dr. Taubert's report, were sufficient to alert ALJ Kraybill to the possibility of marked hyperactivity and thus impose upon him a duty to seek additional evaluations.  (Pl.'s Mem., at 13.)  Plaintiff emphasizes the importance of this issue, noting that because the ALJ found the remaining "A" criteria and all the "B" criteria in Listing 112.11 satisfied, a finding of marked hyperactivity would mean that Natassia meets the listing and is thus disabled; it would be unnecessary even to reach the question of whether Natassia has marked impairments in two of the six domains of functioning.

The court does not agree that the ALJ failed to fully develop the record on this issue. Plaintiff is correct that Dr. Taubert noted in her report that "Natassia displays . . . additional symptoms in terms of hyperactivity, restless/impulsive[,]" (R. 175), and that Plaintiff testified that Natassia was sometimes "hyper." (R. 246.)  Dr. Tonsgard's report, however, constitutes an explicit finding from Natassia's treating physician that marked hyperactivity was not present.  The ME, Dr. Kessler, noted Dr. Tonsgard's finding and testified that the record contained no evidence of marked hyperactivity.  (R. 250, 252.)  In light of this evidence, the brief references to hyperactivity in Dr. Taubert's report and in Plaintiff's testimony, neither of which suggests any significant level of severity, were not, in the court's view, sufficient to impose upon the ALJ a duty to obtain additional evidence.  *See, e.g., Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999) (ALJ not obligated to seek additional expert medical testimony before concluding that child's sickle cell anemia did not constitute severe impairment, where record contained opinions of physicians including claimant's treating physician); *cf. Thompson v. Sullivan*, 933 F.2d 581, 586-88 (7th Cir. 1991) (duty to fully develop record breached where ALJ failed to inquire into status and effects of alcoholism despite diagnosis of chronic alcoholism, overlooked diagnosis of mental disorder, and failed to order additional spinal x-rays even though the ALJ found claimant's complaints credible and x-rays in the

record were nine years old); *see also Luna*, 22 F.3d at 693 (noting that it is the claimant's duty, even when proceeding *pro se*, to "bring to the ALJ's attention everything that shows that [the claimant] is disabled").

### 3. Award of Benefits vs. Remand

Plaintiff contends that because the record "clearly shows" that Natassia has marked limitations in two domains, remand is unnecessary and the court should order an award of benefits. (Pl.'s Mem., at 14.) *See* 42 U.S.C. § 405(g) (conferring judicial authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for a rehearing"). The court declines to do so. An award of benefits "is appropriate only if all factual issues have been resolved," *Briscoe v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005), and where "the record can yield but one supportable conclusion." *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993). Here, while the ALJ failed to confront evidence inconsistent with his conclusion that Natassia did not have marked limitations in three functional domains, the Commissioner has, as noted above, identified some evidence consistent with those determinations. In these circumstances, a remand will afford the ALJ an opportunity to engage in a more meaningful discussion of the conflicting evidence regarding Natassia's impairments.

### CONCLUSION

For the foregoing reasons, the Commissioner's motion (24) is denied, and Plaintiff's motion (21) is granted in part and denied in part. The Commissioner's decision to deny benefits is reversed, and this matter is remanded for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g). Upon remand, the ALJ should reevaluate whether Natassia has marked limitations in the domains of Acquiring and Using Information, Attending and Completing Tasks, and Interacting and Relating with Others. In his discussion of the evidence, the ALJ should provide a thorough explanation of how he weighed conflicting evidence and reached his result.

ENTER:

Dated:  April 26, 2007

                      _____

                      REBECCA R. PALLMEYER
                      United States District Judge